First case this afternoon is 4150619. For the appellant we have James Martinkus for the affidavit Scott M. Dempsey and the caption of the case is Frimel v. Anolles. And Mr. Martinkus, you may proceed. Thank you. May I please report? Counsel? Good afternoon, your honors. As you know, my name is Jim Martinkus and I do represent the respondent Derrick Caetano. Derrick appeals from an order of the trial court entered on July 15, 2014 when Judge Clemens entered a plenary stocking no-contact order. He believes and claims and puts in his brie various positions that we ask you to consider and vacate the order. First, the issue of whether or not there was ever proof of a course of conduct. This sort of order has to be supported by a course of conduct which the statute defines as two or more acts by the same person. And the only evidence that had any reference to Derrick was the incident on the last event. That was the incident where he claims on November 26 that he saw Derrick key the car. If you look at all of the other allegations in which he testified concerning tires being deflated, his license plates had been changed, a lawn chair stolen from the porch, and on and on and on, there is nothing, there has been no evidence presented whatsoever that Derrick had anything to do with this. Somewhat ironically, on November 27, when the trial court was presented with this particular request for an emergency stocking no-contact order, Judge Clemens denied it, finding that there is nothing in the pleading which in any fashion shows or suggests that Derrick Caetano would have been the person who had done all these things. Now, despite that finding, eventually, after hearing the trial court did find, there is sufficient evidence to support the order. But I think the first issue that I raise and ask you to look at carefully and look at the briefs is what evidence, if any, is there in support of two or more acts? There isn't any. The only, if you took and totally believed everything that the petitioner filed and absolutely discounted everything that Derrick said, you'd have at most one event, and that's it. You don't have a second event. I also would ask that you look at the various discrepancies in this case. When you look at the testimony of what the plaintiff, Aaron Frimmel, testified to a trial, there is so many discrepancies in the testimony given, and the testimony was basically impeached by various officers who investigated this particular case. You have Gary and Aaron, father and son, and then you have a girlfriend named Harini. Those are the three people who on November 26th stated that they were there and watched this. Well, Gary and Aaron say they saw Derrick take something out and looked like he scratched the car. Harini, who had no dog in this fight at all, testified she never saw Derrick do anything. She never saw him take out anything or scratch the car and so forth. You have different issues. Aaron and Gary tell, they testify that they told Sarah Links, that's Officer Sarah Links from Urbana, that Derrick took a swing at Aaron. Well, when Officer Sarah Links testifies, she says no, they never said anything. That's all in the testimony. There was no evidence that these were true. You have Aaron's testimony that on November 16th, there was a missing windshield wiper and there was superglue on his valves. Once again, the officer, Matthew McKinney, who actually investigated this, testifies at trial that he saw no missing wiper, that he saw no superglue on any valves. So you have absolutely conflicting testimony with respect to what the investigating officers offered at trial compared to what Aaron or Gary testified at trial. What about Links' testimony concerning what your client said? With respect to which issue, Judge? He couldn't explain the route he was taking? Yeah, I mean, that I think is addressed by what she says is basically he wasn't on a straight route. He lived only four blocks from this. He was taking an alley and through other streets, but that she never pressed him on the issue. I think I addressed that at page 37 of my brief, if I remember, but she never really pressed the issue. She never really asked him about that. Now, the trial judge made a big deal about that. Why wasn't the trial judge entitled to do that? Well, let's assume she was. That would be evidence in support of that one fact, that she could claim that that evidence was in support of credibility issues, and certainly the trial court could do that. But the two other things that the trial court used in terms of trying to prove credibility with respect to Derrick is that she in her rulings testified, well, Derrick knew that the girl Harini was dating Aaron Fremel and introduced him as her boyfriend. The evidence is 100 percent clear on that. It's all set forth in the brief that that never took place. Harini testifies, no, I never mentioned it at all to Aaron. There was no testimony presented that my client, Derrick, knew where Aaron Fremel lived, knew that he drove a red sports car, knew that he was dating or had any relationship with Harini. So those are facts that don't exist. The trial court looked at basically three things in not finding him credible. The girlfriend, I mentioned already, and as Judge Steigman pointed out, the rock issue, that was something. And the third thing was she said that Derrick could not admit he was arrested. Now, this is pure fanciful because on two or three different places in the testimony all presented in the brief, Derrick admits he was arrested. So I don't find any support for the proposition that Derrick was not truthful because he testified he was never arrested. Well, you know, we're looking at a cold record, Mr. Matinkas, and the trial court stated that respondents, your client's inability to answer, to honestly answer questions was striking throughout the proceedings. Why isn't that worthy of respect and deference by us? It is. But I think if you break it down and look at what three factors she specifically uses, then I think that that really Well, but those, this was, how long was this hearing? Well, I think the hearing itself went from, started in November and actually wound up being concluded July 15th of 2014. Well, this is several hours worth of testimony, isn't it?  Well, the point being, the trial judge is permitted to draw the inference that your client wasn't being truthful. Yes. And when you say the three examples, you don't have to provide any examples. This might be just some things that come to mind, but if a trial judge says, I don't believe a witness is being truthful, without providing any examples at all, this is something which I think we should be respectful. I don't quarrel with you, but I think that there's a little bit of difference when the trial court specifically tells you, well, these are the reasons that I'm not, in fact, believing Derek. And when you can look at the record and find, unequivocally, those facts, purported facts, aren't supported in the record. I think that's different. I think you're right. If a judge doesn't say exactly why he doesn't believe him, if he simply says, I've listened to all the evidence and I don't find you credible, I don't quarrel with that proposition. But I think there's a different issue when a trial court specifically lists those factors and says, this is why I don't find you credible. And two of the three are clearly unequivocally wrong. And the third one is certainly susceptible to interpretation, especially if you look at Officer Link's testimony. So it's in that context. The other question, or the other issue I want to really point out to you is that there are other inconsistencies here, too. This issue of the jury trial. Several days thereafter, now we have new photos being presented of before pictures. One of the arguments that my colleague made in the jury trial was that there was no before pictures. You didn't have any before pictures. So all of a sudden now, out of the blue, we have in rebuttal four new pictures that reportedly were taken two days earlier to show that there was no scratches. And I think the most telling of that is that we called Officer Links, the Urbana custodian John Lockhart, and attorney Sarah Perry, who is the assistant attorney who tried the case in the criminal matter, all testified in this particular case that they had never seen these photos, that nobody had ever presented these photos, contrary completely to what, in fact, Aaron Friml testified to. That's pretty significant when Mr. Friml comes up with new evidence out of the blue and says, tells the court, yeah, oh, yeah, I shared all this with these people. And then you bring in the three individuals who would have been directly involved and would have received this, and they all say, no, that never happened. The other thing, of course, is with respect to the pictures, the pictures are not credible because the picture reportedly taken two days before shows the license plate which had been stolen, according to the testimony of Aaron, on October 26, 2013. So now he's in a real box because now he's presenting photographs of his car with the different license plate, different than the photographs that were taken on the date of the scene by Officer that Aaron Friml had. There's absolutely no explanation for that. The other thing is the other photos, the other cars in the photos all have reflections of it. His Red Monster is flat. There's nothing at all. So we went and tried to then get an expert to come in, in the post-trial phase of this, to come in and sort through these things to find out exactly what was taking place. And Andrew Garrett put in a report and basically said, you know, we have to look at the data, and that is only in the device. And this is in Gary Friml's cell phone. Well, nothing's ever said about a missing cell phone. He's ordered to produce these things, and at the very end of the day, after no production of the cell phone, he goes to the provider, and the provider says, no, he never traded the phone. All of a sudden, then, we get an affidavit, well, we don't have that phone. So you've got some very interesting probative issues. And if you look at this from the perspective of my client, one, if Judge Steigman's right, and you give all the credibility in the world of the trial court, and you find that she was certainly at liberty to find that my client was not credible and there was sufficient evidence, you still have the issue of whether or not there was sufficient evidence to, in fact, find a course of conduct. And you look through that transcript, there's no evidence to support it Counsel, would it be proper for this court to draw an inference that Derrick committed the various acts against Friml because the acts discontinued after Derrick was arrested? No, because right after he was arrested, Derrick, I'm sorry, Aaron testified, he took and stopped parking his car on the street. He went and got a private garage. This is campus town, first of all. So the inference could be drawn, it should be drawn, that when you take the car off the street where you're having all these problems, now you're in a private garage that precludes people without access from doing these things. That's the inference that should be drawn, nothing else. I thought he got the private garage after the first arrest. I was referring to the second arrest. I can't sit here and tell you that I can remember exactly, but my recollection, Your Honor, is that after he was arrested, then he went and moved his car into the parking lot. Which arrest are you referring to? I don't remember. But in any event, there were no more lawn chairs found in a dumpster. There's none of those things. No evidence of somebody trying to get in, sliding glass door. Well, I guess I'm asking, from a legal standpoint, is it permissible for this court to draw an inference on the fact that it discontinued? No, I don't think so. Not under these circumstances, Judge. Not where you have a shiny red Mazda park in campus town, where kids and people are maneuvering back and forth. I don't think that's a reasonable inference at all. I don't know what happened. I don't know why it stopped. But again, and I apologize for not remembering the exact timing of this, but I think a big part of it was housing the car in a private, secure facility. So I don't think that's a proper inference. Nor do I think there's any proper inferences here to be drawn as to any of these other purported acts. Derek was not. There's no testimony. He is present that he did anything. There's no testimony that any relationship with this Harini girl. There's no testimony he knew where Aaron lived. No testimony that he knew what car Aaron drove. No testimony that Aaron knew, I'm sorry, that Derek knew Aaron was even your client emailed Aaron after the incident? Either email or contact him simply to say, what happened? If he doesn't know where he lives, doesn't know certain things about him, how does he come up with this email? Judge, I don't remember that to be honest with you, but I think it was through Harini. That's what I thought. What's going on here? He attempted to try to resolve this, that's all. But obviously this did not resolve. So I'm asking that you look at the total of this picture, and I think that even if you give credibility completely to the trial court's view of this, you have some really holes in this case. There's no course of conduct. I think that Aaron Grimmel's testimony to these photos is incredibly telling of what is going on here. There's just no picture now. You didn't realize it had the old plate. The plate you said was gone in October. You're saying now, oh yeah, on November 24th, that was a depiction of this car right before this happened. So you can't have it both ways in this. It seems to me clearly there's enormous gaps of credibility on Aaron's part as well. And I think here you look at this and any fraud upon the court should result in a new trial. Or in this case, I think you could clearly find that even if you absolutely find that Derek did the thing on the 26th, there's no evidence to support any other acts. Thank you. Okay, you'll have rebuttal. Mr. Dempsey. May it please the court and counsel, as the court has already noted, the correct prism through which the court needs to view the appellate record in this case starts with the credibility of the witnesses. And Mr. Martinkus has indicated some issues that he believes relates to the credibility of Gary Frimmel and Aaron Frimmel. And the court appropriately asked him, well, isn't that the province of the trial court to determine issues of credibility? And on this record, there's additional things that the trial judge noted that this court doesn't have the benefit of knowing simply by looking at the cold transcript in this case. And specifically, as part of Judge Clement's ruling, she said, as the response testimony, I found that he was not credible. I found his attitude to be very arrogant. There's no way this appellate court can review this transcript and determine the nature of his arrogance. That's something the trial court was further said. His answers were very calculated. Again, on this record, there's no way this court can look at this appellate record and determine, okay, in this particular circumstances, in response to this question, this is when Mr. Catano was calculating. Especially in cross-examination, Judge Clement's found, I found he would pause. Again, it's impossible to look at the appellate record and find pauses in his testimony that would indicate that he's calculating and trying to answer on direct or cross-examination. There would be rather lengthy pauses before answering, as if to compose an answer that would help his case before actually answering the question. Again, there's no way that this court, on reviewing this appellate record, can make that determination of credibility that Judge Clements was uniquely positioned to be able to make, based on observing Mr. Catano's noise during his testimony, based on observing his demeanor. Judge Clements was able to present a very detailed map, showing every twist and turn that he took from his residence to Hrini Iyer's apartment. And yet, two days after this incident, where he makes the decision that he's going to go meet with Officer Links to explain his side of the story, he's unable to give any real details about how he got from his residence to outside Hrini Iyer's residence. And I think it's important to note that this interview with Officer Links two days after this incident was not something where Mr. Catano Noyes was hauled in by the police and interrogated about the citizen. This is something where he had two days to make the decision that he wanted to go in and voluntarily talk to Officer Links about this situation. He had time. If he truly knew the route that he was taking, he could have presented that map that he presented as an exhibit at the hearing, detailing the route that he took at that time. And yet, two days later after this incident, he's unable to say how he got from his residence to outside Iyer's apartment. Then Judge Clements says, Mr. Catano Noyes also became very animated when asked if he knew where the petitioner's lab was, saying he didn't know the lab the petitioner would be working in. Again, we're talking about Mr. Catano Noyes's arrest for violating the stalking no contact order. Again, looking at this record, there's no way this court can know what specifically Judge Clements was referring to when she said that he got animated when he was talking about that particular aspect of his testimony. And Judge Clements said she also found interesting that Mr. Catano Noyes couldn't even admit that he was arrested. And I think what Judge Clements was referring to was not the arrest for vandalizing here in Frimmell's vehicle, but the arrest for violating the stalking no contact order. And specifically, he wouldn't admit initially that he was arrested. When he was asked very specifically, were you arrested for violating the order of protection? Correct. His answer was, that doesn't mean I did it. He wouldn't even admit on cross-examination that he was arrested. And that's a perfect example of the type of response that we got constantly through the cross-examination of Mr. Catano Noyes that led to this credibility. What about Mr. Martinkus' point about the photograph supposedly showing the marks, if I understand correctly, with the license plate that seemed to be inconsistent, according to Mr. Martinkus, with what your client had explained? I think there's several important things that need to be noted about that. First off, contrary to what the respondent claims in this case, this was not surprise rebuttal evidence. It's important to note, first off, that these were photographs that were shown to Mr. Catano Noyes during cross-examination as part of the respondent's case in chief. And with respect to three of those exhibits, he admitted that each of those fairly and accurately depicted the parking lot that he claims he didn't walk through where Mr. Aaron Frimmell's vehicle was parked. So first off, there's absolutely no evidence that those That wasn't my question. There is no evidence. The question dealt with the appearance of the license plates, which were supposedly stolen, being shown in the photograph, which was contrary to the time frame that your client spoke of. The photographs show the vehicle had two different license plates on it, a different license plate on the front and a license plate on the back, which would be The front photograph shows a partial view of the license plate that's different than the license plate on the back. And so that's not in any way consistent with the license plate being stolen. And it appears that what happened was that after the license plates were stolen, that then one of the old license plates that was stolen was put back on the vehicle after my client obtained new license plates. And that was fully explained in the affidavits that were submitted by Gary Frimmell and Aaron Frimmell as part of the post-judgment proceedings. I thought Mr. Martinkus, in addition to the discrepancy between the front license plates and the back license plates, was arguing that the time the pictures were taken was during the period where your client had said that the license plates had been stolen and no license plates were even available to be on the vehicle. No. That's not what he's arguing? No. Once the license plates were stolen, within a day or two, new license plates were purchased. And so if you look at our memorandum of law that we filed in support of, in opposition to the post-trial motion, we attached the receipts showing the purchase of the new license plates. And so the new license plates were purchased, it looks like, on October 28, 2013. So that's about a month before this November 26, 2013 incident. So my client goes, he purchases new license plates in the state of Missouri, puts them on the vehicle. As of November 26, 2013, when this incident occurred, there are two separate license plates on the vehicle. And that was later reported to the police department once my client discovered there were two different license plates on the vehicle. But in any event, this claim that these photos have somehow been altered or airbrushed or the metadata has been changed, there's completely no evidence that that has occurred in any fashion. So in order to get the response foot in the door for this whole series of post-trial motions that were filed, the respondent claims that they had had these photographs analyzed by a website called Is It True? And it showed that there was some sort of manipulation of these photographs. My client had those same photographs examined by the same website, and it showed that the photographs had not been altered or manipulated. Is all this presented to the trial court? Yes, it's part of the Memorandum of Law in Opposition to Post-Trial Motion that was filed on April 15, 2015. And that gets to the standard review on a post-trial motion. That's an abuse of discretion. And so the trial court had the benefit of all this contradictory information. They had the benefit of this claim that somehow these photographs that were shown to Derek Catano and Noyes on cross-examination were surprise rebuttal evidence. They had the benefit of Garrett Discovery's examination of these photographs. They had the benefit of the receipts showing that my client purchased new license plates. They had my client's results of Is It True? examination of the photographs. The trial court had the ability to weigh all of that evidence. And I think it's important to note that these photographs were supposedly examined by Garrett Discovery to show that, to support the respondent's claim that these photographs had been altered, airbrushed, or manipulated, or the metadata had been changed. Garrett Discovery can't conclude that. There is no evidence of that. I think there's a lot of problems with Garrett Discovery's credibility in the report that they prepared about their examination of these photos. They apparently were confused about the examination of these photos with some other work that they were working on, because they included references to examination of some DVDs that were not relevant to this case. There was some claim that someone from Garrett Discovery had talked to someone named Lisa at Best Buy about the transfer of data from Gary Firmal's iPhone that he traded in, in February 2013. We produced an email from the manager at Best Buy saying there's no one named Lisa that works here at Best Buy, and that there's no way that anyone would be able to tell if data was transferred from an iPhone. We don't keep records of that. So there's huge credibility issues with Garrett Discovery's supposed investigation. But even if you take it at face value, they weren't able to determine if there was anything that was altered about these photographs. And for a post-trial motion to be successful, the response has to show that there's some newly discovered evidence, and apparently they're claiming there's something about these photographs that were altered that they weren't aware of at the trial. Well, they had the advantage of being able to have these photographs at the trial. This is simply an argument that they didn't raise when these photographs were shown to Mr. Catano-Annoyes at the hearing, and he admitted that they fairly and accurately depicted the layout of the parking lot on November 26, 2013. So it's not any sort of newly discovered evidence. It's clear from the case law that you can't use newly discovered evidence solely for the purpose of trying to impeach a witness at the hearing. And that's, again, clearly what the purpose of this is, is that they're trying to impeach the credibility of both Gary and Erin Frimmel by claiming there's something newly discovered about these photographs that were used at the hearing. And you can't use newly discovered evidence solely for the purpose of impeachment. And that's clearly what they're doing. There's no other reason for it other than the tax credibility of Gary and Erin Frimmel, who Judge Clements found to be credible. But Judge Clements had the benefit of having all this information in determining whether or not there was a basis for granting the post-trial motion, and ultimately she decided there wasn't a basis for granting the post-trial motion. It's clearly not an abuse of discretion. She was presented with all the evidence, both showing that these photographs had supposedly been manipulated, evidence that these photographs had not been manipulated. The respondent has argued that there's a complete lack of circumstantial evidence in this case establishing a course of conduct. And I think there's really a mountain of circumstantial evidence in this case that establishes a course of conduct on the part of Mr. Catano and Noyes to damage my client's vehicle. And again, it's up to the trier of fact to determine what inferences are to be given to the circumstantial evidence in this case. Most importantly, we have direct evidence of an incident on November 26, 2013 that is very similar to another incident that occurred when my client's vehicle was parked at his residence. So we have damage to my client's vehicle on November 26, 2013, and Mr. Catano and Noyes was observed running his hand across the hood of Erin Frimmel's vehicle, leaving a scratch. We have an incident that occurred on September 27, 2013, where Erin Frimmel's vehicle was keyed while parked at his residence. We have damage at two different locations. And I think it is significant that the damage stopped once Mr. Catano and Noyes was arrested for the damage that occurred on November 26, 2013. There was some testimony that, yes, he was storing his vehicle in a garage, but he was also still visiting Granny Eyre at her residence. And so if this was damage that was being done by someone who did not have any contact with or any relationship with either Granny Eyre or Derek Catano and Noyes, there would be no reason why the arrest of Derek Catano and Noyes would have led to this damage being stopped. And there would have been continuing damage if it was just some random person who happened to be walking by Erin Frimmel's house and decided he wanted to vandalize his lawn chairs. Well, what about Mr. Martinkus's point that the car had been moved into a garage and that if it had been some unknown person who decided he'd like to mark up red Mazdas, no longer had access to the car on the street? It was also still visiting Granny Eyre at her residence. So he was still visiting Granny Eyre at her residence. They were in a dating relationship. He was still parking the vehicle in her parking lot. And so we have the photos of the parking lot. That's an open area. So some of the keying occurred there, too. Correct. Yes. Yeah. Specifically, the November 26, 2013 incident. There was an incident on November 16, 2013 in which tires were deflated. There was super glue that was used on the windshield wipers of Erin Frimmel's vehicle. So there's damage at two different locations. And the common connection to Mr. Frimmel and Derek Catano and Noyes is Granny Eyre. I think there's a mountain of circumstantial evidence that Mr. Catano and Noyes was infatuated with Granny Eyre. He wanted a relationship with her. She didn't want that. And that's what ultimately led to the damage of Erin Frimmel's vehicle. And although- Regarding the November 26 incident, were there criminal charges filed? There were criminal charges filed. Was that criminal damage to property? I believe so, yes. And the finding by the jury was not guilty in that case? That's correct, yes. Okay. What should we read into that? Absolutely nothing. It's a different scenario proof. Different proof. I don't even know what witnesses they called in that case. But obviously you're talking about a very different burden of proof in a criminal case where it's required to be proved beyond a reasonable doubt versus the preponderance of the evidence standard that is used in this case and a civil case. So I don't think that has any bearing whatsoever on this court's determination as to whether or not Judge Clements made the appropriate determination. Again, I don't know what witnesses were called in the criminal case. There could have been different witnesses that were called. There could have been different questions that were asked of those witnesses. It has no bearing whatsoever on this case. And to try to say that just because he was found not guilty in a criminal trial doesn't mean that he didn't damage the vehicle on November 26, 2013 where the burden of proof is by a preponderance of the evidence has absolutely no correlation whatsoever. So even though the testimony was that Harini Iyer had never actually introduced Erin Fremmel as her boyfriend, there is testimony that there was an occasion where Mr. Catano-Noyes met up with Harini Iyer and Erin Fremmel outside Cranor and they may have been holding hands at that point. So there are multiple occasions where Derek Catano-Noyes came in contact with Harini Iyer and Erin Fremmel where he reasonably would have led to believe that they were in some sort of romantic relationship. Again, they could have been holding hands on that occasion is what the testimony was. He acted very strangely when he came in contact with the two of them. There was an incident where Harini Iyer found Mr. Catano-Noyes outside of her apartment. She did not invite him there. She just found him outside her apartment. And the next time they lunched together, Mr. Catano-Noyes tells Harini Iyer, well, now that I know where you live, I'm going to stalk you. So he obviously knew where Harini Iyer lived. So it's interesting to note that the vandalism began shortly thereafter that. There's testimony from Mr. Catano-Noyes. Did the trial court address whether or not it found that testimony credible? I don't think she made any specific findings. She did. The defendant or the respondent denied that, did he not? I'm trying to remember. No, I think he admitted that he said that, but he claimed he was joking is what he said. Correct. But they did make, Judge Clements did make specific findings as to the credibility of Gary Fermel. She found him to be certainly believable and very credible. Most importantly, I think she made credible findings as to Harini Iyer. And Judge Clements found that her testimony was credible as well. And I think it's important to note that there's been absolutely no attempts whatsoever by the respondent to impeach Ms. Iyer's credibility, either at the trial court or at the appellate court. There's no question about her credibility. And on the morning of November 26, 2000. Well, doesn't that kind of cut against you? Because she testified she didn't see any scratching of the vehicle or keying of the vehicle on the November 26 date. Well, because she wasn't looking in that direction. I think the testimony she gave was that she was going towards her mailbox when Aaron came running up to her and said he's here. And by the time Ms. Iyer turns around, he's already keyed the car and she sees him crouching under a row of trees by Aaron Fermel's car. So it wasn't that she didn't see it. It's just she wasn't in line of sight where she could see the vehicle. And so she says, well, I was shocked and surprised to see Mr. Catano Noyes crouching under a row of trees next to Aaron's car. There's no reason to be here. I had no reason. I had no reason to believe why he should be out there. So by her own testimony, she was shocked that he was somehow outside of her residence on that early morning. But it's not that she didn't see it. I mean, if this was a situation where these were complete fabrications, you think we would have come into court with Ms. Iyer saying, oh, yeah, I saw the whole thing. But she was simply facing the wrong direction. She was getting her mail at the time this happened, and it was only after Aaron Fermel alerted her that Mr. Catano Noyes was there that she then turned around. He had already committed the act at that point and was crouching under this row of trees and was trying to get away from Aaron Fermel's car at the time. I think it's significant that the damage on November 26, 2013 is consistent with other damage that was done to Aaron Fermel's vehicle. It's significant and also substantial circumstantial evidence that some of the damage to Aaron Fermel's vehicle involved superglue. When Mr. Catano Noyes is arrested, he has a tube of superglue with him. He claimed that this was part of his hobby, where he would superglue miniature figures to various places around town. But again, when he talked to Officer Links only a couple days after this incident, he never mentions that he's in the area of Rena Iyer's apartment for purposes of supergluing miniature figures to someone else's property. I think it's significant that the very nature of his hobby is damaging other people's property by supergluing miniature figures to property that's not his. What about the testimony of the officer that he didn't find superglue? I think that he wasn't specifically looking for it. I think Aaron Fermel's testimony was that he didn't notice the superglue until after the officer had already left. I believe that's what Aaron Fermel said, so I don't think Aaron Fermel even mentioned it to the officer at that point. I think he said he didn't realize the superglue was there until he tried to inflate the tires and that sort of thing. Correct. It was after the officer had left. So, Your Honor, based on this record, I think there is a mountain of circumstantial evidence that shows the course of conduct by Mr. Catano Noyes that damaged my client's vehicle and asks that the order of the trial court be affirmed. Thank you, Mr. Dempsey. Mr. Martinkus, you have rebuttal. Thank you. Mr. Dempsey talks about the inference that you can draw. And if you're looking at his argument, he asks you to draw an inference that because my client was involved in this 11-26 incident, according to the testimony of the plaintiff, that somehow you should decide that he, in fact, would have been involved in the incident of 9-27-13. There's no evidence to support it. It's kind of like in PI cases where if someone's had 15 bad accidents where they've been negligent, if you get it to the 16th, I can't use any of the first 15 as evidence and somehow by inference that he's negligent on this occasion. There's no evidence to support it. The fact that he had superglue on him because he has this hobby and so forth, that's 12 days later. I mean, if you had examined him and he had superglue on that occasion when the officers looked at him right then and there, that might be a reasonable inference. But there's no reasonable inference to be drawn here just because he was involved, if you believe everything that was said here by the plaintiff on 11-26, that somehow he was also involved in 9-27-13. I don't agree with counsel in terms of the method of this rebuttal evidence. I don't think this was simply rebuttal evidence that was going to be used from our perspective to impeach credibility. He put that on as substantive evidence to show that there was before pictures. And you can talk all you want about these different pictures, but Sarah Links takes a photo on November 26 showing license plates and then Aaron says, well, here's a photo two days before and they have different plates. So somehow you have to explain away how in those two days those plates got changed. There's nothing to support it. The inference to be drawn there is that the picture was not taken on November 24. It was taken sometime in October. The fact that the other cars in the picture all have reflections, why would his not have reflections? There's no explanation for any of these things. The other thing, too, is you have Officer Links, police, evidence. I'm not sure I understand the reflection argument. What does that mean? I think, Judge, if there's a series of cars in the photo and all of them but one show reflections of tree branches and everything, why would the red Mazda not have a reflection as well? Well, what is your suggestion? That it was doctored in some fashion. Oh. That it was doctored, it was airbrushed, something. And, again, the counsel talks about, well, there was no evidence presented. We couldn't do it because his client's father at the very end says, I don't have the phone. And our expert says, you've got to have the device. That's the only way we can go in there and look to see if there's metadata which was altered or changed. But if you look at this case and you look at it fairly and objectively, there is no support for the proposition that my client committed any of these other acts, period. And, again, you have incredible distinctions between the testimony of Assistant State's Attorney Perry comes in and says, he never showed us these photos, and he's saying, yeah, I gave all these photos to them earlier. So you have some incredible distinctions between what Aaron says and what, in fact, police officers say investigate this. And I think that's where you have to give credibility as well. So for all those reasons, Your Honor, I'd ask that you reverse this decision. Thank you. Thank you, Mr. Martinkus. Thank you, Mr. Dempsey. The case is submitted and the court stands in recess.